**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**DWIGHT ALAN ALDERMAN,**

      **Plaintiff,**

**vs.**                                **CIVIL ACTION NO. 2:15-15437**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered January 5, 2016 (Document No. 7.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 12 and 13.)

The Plaintiff, Dwight Alan Alderman (hereinafter referred to as "Claimant"), protectively filed his application for Title II benefits on July 16, 2012, alleging disability beginning July 3, 2010 due to "complications from childhood fractures in back and leg", high blood pressure, sleep apnea, and anxiety.[1] (Tr. at 334, 335-343, 355.) His claim was denied on October 25, 2012 (Tr. at 270-274.) and again upon reconsideration on November 26, 2012. (Tr. at 278-284.) Thereafter,

---

[1] In his Disability Report – Appeal, dated January 7, 2013, Claimant alleged the pain in his back and leg increased, and that he had more anxiety. (Tr. at 379.)

Claimant filed a written request for hearing on December 27, 2012. (Tr. at 285-286.) An administrative hearing was held on March 24, 2014 before Administrative Law Judge ("ALJ") William R. Paxton. (Tr. at 216-247.) The ALJ heard the testimonies of Claimant (Tr. at 221-241.) and Vocational Expert ("VE") Patricia Posey. (Tr. at 241-245.) On May 5, 2014, the ALJ entered a decision finding Claimant was not disabled. (Tr. at 201-215.)

The ALJ's decision became the final decision of the Commissioner on October 9, 2015 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6.) On November 23, 2015, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not,

the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 404.1520(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4).

In this particular case, the ALJ determined that Claimant last met the requirements for insured worker status on March 31, 2014. (Tr. at 206, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity during the period of the alleged onset date of July 3, 2010 through his date of last insured on March 31, 2014. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: obesity; coronary artery diseases status post stenting of the right coronary artery; diabetes mellitus; hypertension; obstructive sleep apnea; chronic cervical and dorsolumbar strain; posttraumatic arthritis; mood disorder; and anxiety disorder. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 207, Finding No. 4.) Next, the ALJ found that Claimant had a residual functional capacity ("RFC") to perform sedentary work as defined in the Regulations:

> except he cannot climb ladders, ropes, or scaffolds. He could not kneel, crouch, or

crawl. He could occasionally balance, stoop, and climb ramps and stairs. He must avoid concentrated exposure to extreme heat and cold, vibration, fumes, odors, dusts, gases, poor ventilation, and avoid all exposure to hazards such as heights and machinery. He is further limited to understanding, remembering, and carrying out simple instructions. (Tr. at 210, Finding No. 5.)

At step four, the ALJ found that Claimant was incapable of performing past relevant work. (Tr. at 214, Finding No. 6.) At step five of the analysis, the ALJ found that having been born on June 16, 1968 and 45 years old, Claimant was a younger individual on the date last insured. (Id., Finding No. 7.) The ALJ found that Claimant had at least a high school education and was able to communicate in English. (Id., Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled though the date last insured, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could have performed. (Id., Finding Nos. 9 and 10.) On that basis, the ALJ found Claimant was not disabled. (Tr. at 215, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Issue on Appeal</u>[3]

The issue presented is whether the ALJ impermissibly provided his own lay opinion in lieu of a medical expert when faced with conflicting evidence, and whether substantial evidence supports the ALJ's assessment of Claimant's mental limitations in the RFC finding.

<u>Claimant's Background</u>

At the time of the alleged onset date, Claimant was considered a "younger individual". (Tr. at 214.) <u>See</u> 20 C.F.R. § 404.1563(c). He completed the twelfth grade and did not attend special education. (Tr. at 356.) His past relevant work experience included assistant manager in both retail and restaurant establishments and bartender. (<u>Id</u>.)

---

[3] Prior to the Appeals Council denying Claimant's request for review, Claimant submitted additional medical evidence. (Tr. at 7-199.) The ALJ held the record open for seven days (Tr. at 204.) after the administrative hearing, however most of the evidence Claimant submitted post-dated the ALJ's decision. This evidence included: records from Marietta Memorial Hospital dated March 15, 2015 through March 19, 2015 concerning Claimant's complaints of chest pain, numbness in the back of his head, and shortness of breath, however, further examinations revealed no cardiac markers or other abnormalities (Tr. at 7-59.); records from Marietta Memorial Hospital dated March 19, 2014 through May 9, 2014 which included routine blood tests and x-rays of Claimant's left and right knees, thoracic spine, and lumbar spine indicating normal findings (Tr. at 60-69.); an MRI scan of Claimant's lumbar spine taken on May 19, 2015 which revealed "focal left foraminal disc herniation contacting the exiting left L4 nerve root. Moderate left foraminal stenosis", but an otherwise normal lumbar spine (Tr. at 70-71, 153-154.); physical therapy treatment notes from Mountain River Physical Therapy dated January 21, 2015 through March 10, 2015 concerning Claimant's lumbar spine (Tr. at 72-132.); PARS follow-up reports to physical therapy dated August 25, 2014 through May 19, 2015 (Tr. at 133-154.); Westbrook Health Services records from June 11, 2014 to June 4, 2015 indicating Claimant had regular appointments every three months and remained stable on his medications (Tr. at 155-175.); and records from Memorial Health System from May 8, 2014 through June 11, 2015 indicating Claimant had regular appointments every three months and remained stable on medications. (Tr. at 176-199.) Claimant does not rely upon this evidence in his appeal or as a challenge to the Appeals Council decision.

The Relevant Evidence of Record

    Claimant's Statements in SSA Forms:

       In addition to his medical conditions, Claimant stopped working because "[his] wife started working and it was easier for me to stay home and take care of my 3-year-old daughter". (Tr. at 355, 405-406, 525-528.) Also, he inherited $150,000 and believed it was enough that he could retire from work. (Tr. at 405-406.) Besides caring for his young daughter while his wife worked (Tr. at 363.), Claimant cared for his personal needs, prepared meals, laundered clothes, cut grass with a riding mower, drove, and shopped in stores. (Tr. at 364-365.) He needed no reminders to take medicine, to care for his personal needs and grooming, or to go places. (Tr. at 364.) Claimant socialized on Facebook and Twitter daily. (Tr. at 366.) He denied problems with memory, completing tasks, concentration, understanding, following directions, or getting along with others. (Tr. at 367.) Claimant also indicated that he could finish what he started and pay attention (Tr. at 367-368.) and getting along with others. (Tr. at 367.) He stated that he was "not very good" at handling stress, for which he takes medication and counseling; he noticed that he argues and yells a lot more. (Tr. at 368.)

    Jill Powell, D.O., Treating Physician:

       From July 2010 through April 2014, Claimant received routine primary care treatment from Jill Powell, D.O., of Marietta Health Care Physicians, Inc., for anxiety along with various physical complaints. (Tr. at 422-497, 587-614.) During the relevant time period, Dr. Powell observed Claimant to be anxious on multiple occasions, and he reported having mood swings despite compliance with his medications. (Tr. at 461, 463, 465, 564.) Despite his occasional complaints of anxiety, Dr. Powell documented no abnormal mental status findings, but instead routinely

reported that Claimant was alert and oriented. (Tr. at 426, 456, 458, 460, 462, 464, 466, 603.) Treatment records given to Dr. Powell by other providers indicated that Plaintiff displayed a normal affect, appropriate behavior, normal orientation, clear and coherent speech, and a pleasant demeanor. (Tr. at 414, 431, 435, 483, 495.) Dr. Powell prescribed Claimant Paxil and Ativan for anxiety. (Tr. at 422-97, 587-614.) In September 2010, Claimant reported that his anxiety was "better controlled" and he "rarely needed Ativan". (Tr. at 463.)

On March 13, 2014, Claimant visited Dr. Powell for a physical and to obtain disability forms (Tr. at 602-607.); he complained of thoracic, lumbar, and knee pain, but not anxiety. (Tr. at 604.) This was the first examination of record when Dr. Powell documented specific psychiatric findings. (Tr. at 607.) Dr. Powell reported that Claimant exhibited a grossly normal mental status, a normal affect, and normal judgment (Id.), and that he had a comfortable general appearance and was alert and oriented times three. (Tr. at 605.) Dr. Powell completed a Physical Residual Functional Capacity Questionnaire (Tr. at 608-614.), stating that Claimant may have "uncontrolled mood swings" (Tr. at 611.), and his bipolar disorder would likely affect his ability to work on a sustained basis. (Tr. at 614.) Dr. Powell predicted Claimant would be absent from work about two days per month (Tr. at 613.) however, she did not believe he was capable of working a full-time work schedule at any level of exertion. (Tr. at 614.)

On April 4, 2014, Dr. Powell reported that Claimant's general appearance, mental status, affect, judgment, and orientation were normal. (Tr. at 632-633.)

Westbrook Health Services:

At Dr. Powell's referral, from June 2012 through December 2013, Claimant received mental health treatment at Westbrook for mood swings and anxiety. (Tr. at 498-533, 580-586.)

Claimant explained he had been prescribed Paxil and Viibryd, but Dr. Powell wanted to confirm his bipolar diagnosis. (Tr. at 514.) Claimant stated he did not believe he was bipolar and thought his anger was caused by stress; he stated that as long as he was not provoked, he was fine. (Id.) Claimant's mental status examination was noted to be normal, but Claimant did admit to multiple symptoms including sleep disturbance, feelings of worthlessness, racing thoughts, anger, trouble concentrating, easily distracted, anxiety, mood swings, relationship and financial stressors, avoidance behaviors, verbal and physical aggression, inability to complete tasks, and work difficulties. (Tr. at 519-520.) Claimant stated he hated large crowds, did not like people to be behind him, and liked to be "in the control position". (Tr. at 520.) He was diagnosed with mood disorder, not otherwise specified, and was recommended for behavioral health counseling and medication management; he was assigned a Global Assessment of Functioning (GAF) score of 60, indicating moderate/borderline mild symptoms. (Tr. at 520-521, 531.)

During his intake appointment in June 2012, Claimant reported that he was "stay-at-home-dad" of a three-year-old daughter. (Tr. at 525, 528.) He reported that physical impairments, such as pain in his back and losing his breath easily, prevented him from working. (Tr. at 526, 532.) On mental status examination, he was well-groomed and fully oriented with a normal mood, cooperative attitude, appropriate affect, normal speech, and normal motor activity. (Tr. at 529.) He displayed a fully intact memory, a logical thought process, no hallucinations, and intact judgment. (Id.) Claimant denied suicidal/homicidal ideations. (Tr. at 530.)

A Routine Abstract Form – Mental, dated August 15, 2012, was completed but not signed by a provider from Westbrook Health Services. (Tr. at 523-524.) The statement indicated Claimant had begun treatment on July 11, 2012 and had completed three visits at that time and was compliant

with his treatment plan. (Tr. at 523.) The provider stated Claimant was diagnosed with mood disorder NOS with a rule out for personality disorder and was pending an initial psychiatric evaluation appointment. (Id.) The provider opined that Claimant's "depressed and irritable mood would be likely to result in disruptive conflicts with workers and supervisors in a work setting." (Id.) The provider explained that Claimant had a tendency to isolate himself and to withdraw from most activities outside of his home. (Id.) It was noted that Claimant had a depressed and irritable mood, a labile affect, moderately deficient insight, social functioning, concentration, task, and persistence, and retarded psychomotor activity due to chronic back pain, otherwise, the provider reported that Claimant's mental status findings were normal.

On September 11, 2012, Claimant underwent a Psychiatric Diagnostic Interview with Gongqiao Zhang, PA-C and Amelia McPeak, M.D. (Tr. at 510-512.) Claimant reported having mood swings for the past year and admitted to becoming mad and yelling for "no reason". (Tr. at 510.) He stated his mood swings had been improving with Paxil and Viibryd but recently his symptoms had worsened again. (Id.) He admitted to feeling irritable, hopeless, worthless, and guilty and stated that sometimes his mind felt "jumbled together". (Id.) He denied a history of psychiatric treatment or hospitalizations (Tr. at 510-511.), and admitted a history of substance abuse (alcohol and drugs) and smoking cigarettes since 1985. (Tr. at 511.) Claimant stated that he last worked in April 2011 (approximately nine months after his disability onset date). (Tr. at 512.) PA-C Zhang and Dr. McPeak observed Claimant to have a slightly depressed mood with full and appropriate affect and fair insight and judgment. (Tr. at 512.) Dr. McPeak also observed that Claimant had a normal gait, normal orientation, a cooperative attitude, normal behavior, normal speech, and a full and appropriate affect. (Id.) Claimant displayed intact attention/concentration,

average fund of knowledge, intact memory, fair insight and judgment, and a goal-directed thought process. (Id.) He denied suicidal/homicidal ideations and hallucinations. (Id.) Claimant was diagnosed with mood disorder, NOS, assigned a GAF score of 65, and was prescribed Lamictal and continued on Viibryd. (Id.)

From October 2012 through December 2013, Claimant attended 15-minute medication management visits with Dr. McPeak approximately every one to two months. (Tr. at 499-508, 580-586.) Claimant consistently denied significant low moods or depression, episodes of mania, hallucinations, delusions, or paranoia. (Tr. at 499, 501, 506, 581, 583, 585.) At each visit, he displayed a cooperative attitude, normal behavior, normal speech, a euthymic mood, a full and appropriate affect, linear and goal-directed thought processes, intact associations, intact attention and concentration, and fair insight and judgment. (Id.) Claimant often reported doing well or "very well" on his medication regimen. (Tr. at 499, 506, 582, 585.) Dr. McPeak routinely described Claimant as "psychiatrically stable" or "psychiatrically better". (Tr. at 499, 507-508, 582, 586.) Dr. McPeak prescribed and adjusted as necessary Claimant's medication regimen. (Tr. at 499-508, 580-586.)

On October 9, 2012, Claimant reported feeling much better since he had started to take lamotrigine, but admitted he continued to experience some mood swings. (Tr. at 508.) His dosage of lamotrigine was increased to 100 mg. (Id.) On December 4, 2012, Claimant stated he was doing well on his medications, and his mental status examination was basically normal. (Tr. at 506- 507.) In April 2013, he returned to Westbrook after missing an appointment due to his heart attack. (Tr. at 501.) He had stopped taking lamotrigine in January but wanted to start again. (Tr. at 501-502.) In June 2013 and August 2013, Claimant reported he was doing well on 100mg of lamotrigine,

(Tr. at 499-500, 585-586.), however, by October 2013, he stated that while lamotrigine worked initially, it was beginning to "wear out". (Tr. at 583.) Lamotrigine was increased to 150 mg in an attempt to better control Claimant's depression and mood swings. (Tr. at 584.) In December 2013, he reported that the increase in lamotrigine worked well. (Tr. at 581-582.)

State Agency Psychological Consultant:

In October 2012, at the initial level, Ann Logan, Ph.D. reviewed the file and opined that Claimant's affective disorders caused no restriction in his activities of daily living, mild difficulties in social functioning, no difficulties in concentration, persistence or pace, and no repeated episodes of decompensation, each of extended duration. (Tr. at 252.) Dr. Logan concluded that Claimant's mental condition was not severe. (Id.) Subsequently, in November 2012 at the reconsideration level, Joseph A. Shaver, Ph.D. reviewed the updated record and affirmed Dr. Logan's opinions. (Tr. at 263.)

State Agency Medical and Psychological Examiners:

During a consultative internal medical evaluation with Stephen Nutter, M.D., on September 13, 2012, Claimant reported that he last worked as a bartender and cook in April 2011. (Tr. at 398.) Dr. Nutter observed that Claimant exhibited normal intellectual functioning, good recent and remote memory for medical events, and no difficulty understanding conversational voices. (Id.)

On September 20, 2012, Claimant was evaluated by Paul A. Dunn, Ph.D., a State agency psychological consultant. (Tr. at 404-411.) Claimant drove himself to the appointment without difficulty and arrived 30 minutes early. (Tr. at 404.) He displayed adequate hygiene and grooming. (Id.) Claimant reported that he quit working after he inherited $150,000, and became a "stay-at-home dad". (Tr. at 405-406.) Dr. Dunn stated that Claimant was a poor historian (Tr. at 405.);

Claimant reported that he began outpatient mental treatment to deal with stress two months earlier at Westbrook Health Services. (Tr. at 407.) Dr. Dunn observed him to have a moderately deficient recent memory and pace, as well as a mildly deficient remote memory and judgment. (Tr. at 407-408.)  On mental status examination, Claimant exhibited "very slow" motor activity, low- average energy, a labile affect, a sad-to-cheerful mood, appropriate eye contact, was outgoing, friendly, and cooperative, had clear speech, a normal orientation, goal-directed thoughts, and he denied having a history of hallucinations. (Id.) He exhibited normal concentration, persistence, immediate memory, and social functioning; moderately deficient pace and recent memory; and mildly deficient remote memory (Tr. at 408.) As for his daily activities, Claimant stated that he spent a lot of time on the computer "doing Facebook," lay down in his bedroom while his daughter played with her toys on the floor, prepared dinner, and watched television with his wife. (Id.)

Dr. Dunn assessed mood disorder, NOS, and assigned a GAF score of 65. (Id.) Dr. Dunn rationalized that: "[t]he claimant does have a Mood Disorder with some anxiety and some depression. This affects his recent memory to a mild degree.  He has some judgment problems and some remote memory difficulty, likely secondary to concentration difficulties associated with his Mood Disorder". (Id.) Dr. Dunn opined that Claimant's prognosis was good and he could manage funds if awarded. (Tr. at 409.)

The Administrative Hearing

Claimant Testimony:

Claimant testified he was married and lived with his wife and five-year-old daughter. (Tr. at 222.) He stated he last worked in 2009 as a bartender, doorman, cook, and stocker, but left because business was slow, and he was unable to stand and sit for long periods of time or tolerate

drunken people. (Tr. at 222-223.) Additionally, he stated he had worked in a restaurant first as a dishwasher and then as the assistant manager. (Tr. at 224.) He was also previously employed as a stocker and assistant manager for a retail store. (Id.)

Claimant testified he became disabled in July 2010 due to chest pains and sleep apnea. (Tr. at 225.) He uses a C-PAP machine every night, which helps. (Tr. at 226.) In March 2013, Claimant stated he had a heart attack and underwent heart catheterization and a stent placement. (Tr. at 226-227.) Since then, he experienced pain in his back and his heart fluttering. (Tr. at 228.) He admitted the extra heartbeat made him more nervous because he was afraid he would have another heart attack while at home alone. (Id.) Claimant stated he experienced fatigue and lightheadedness when standing. (Tr. at 229.)

Claimant explained he had fractured this thoracic spine and right femur in a car accident when he was seven years old. (Tr. at 230.) He described pain in the center of his back down to his tailbone and through his hips. (Id.) He attempted chiropractic care, but it did not help. (Id.) Claimant stated he could bend at the waist, but not very far, and left his shoes tied so he would not need to bend over. (Tr. at 230-231.) He stated walking up hill caused pain but he could walk approximately one-quarter to three-quarters of a mile, stand about ten minutes, and sit twenty minutes before needing to change position due to leg pain. (Tr. at 231-233.) Claimant testified that his physician recommended he elevate his legs while sitting. (Tr. at 233-234.) He admitted to spending most of his day lying down to alleviate his pain. (Tr. at 234.)

Claimant testified he had been diagnosed with mood/bipolar disorder and indicated his medicine usually worked unless he heard repeated or loud sounds. (Id.) In those instances, Claimant explained, "it's almost like I didn't take my medicine," and he would become upset and

yell. (Id.) He stated his pain only sometimes affected his mood, since he was mostly at home lying down. (Tr. at 235.) He stated his daughter was home with him during the day but was able to take care of her own basic needs, such as showering, dressing, and getting snacks from the refrigerator. (Tr. at 236.) Claimant testified that he would likely "call off" from work because "people would get to me enough to where I'd want to take a break from the people". (Tr. at 240.)

Claimant explained his physical conditions had worsened since his heart attack. (Tr. at 238.) He stated his knees swelled, his lower back had a knot, and his tailbone felt like it was bruised. (Id.) He stated he could not pick things up from the floor due to pain, but he could lift 10 to 12 pounds from table height. (Id.) He indicated he was restricted in overhead reaching due to back pain which made him unable to grasp objects. (Tr. at 239.) Claimant also stated he was out of breath from walking 30 feet from the lobby to the hearing room. (Tr. at 241.)

Vocational Expert ("VE") Patricia Posey Testimony:

The VE described Claimant's past work to include a bartender, cook, bouncer, and a number of other jobs she would place in "a composite category of work" from the light to medium exertional levels. (Tr. at 243.) The VE also stated his work as a stock person and assistant manager in a retail store would be semiskilled, medium work, and his work as an assistant manager in a restaurant would be skilled, light work. (Tr. at 244.)

The ALJ asked the VE whether a hypothetical individual with Claimant's vocational profile and RFC could perform any work. (Tr. at 244.) The VE stated the individual would be able to perform work as a document preparer (DOT No. 249.587-018), food sorter (DOT No. 521.687-086), and folder (DOT No. 685.687-014). (Id.) The VE further testified an individual who needed to lie down for up to 30 minutes outside of the normally scheduled breaks or needed to elevate his

legs for up to four hours per day would be unable to maintain employment. (Tr. at 245.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant's primary challenge to the ALJ's decision is that the ALJ improperly assessed his mental limitations because the ALJ discounted all the psychological medical opinion evidence and independently crafted the RFC finding which was unsupported by uncontroverted opinion evidence. (Document No. 12 at 10-14.) The only cure for this harmful error is remand.[4] (<u>Id</u>. at 11-13.) Claimant cites <u>Webster v. Colvin</u> 2014 WL 4060570 (M.D.N.C. August 15, 2014) as analogous to the matter at bar: an ALJ rejected every medical opinion of record regarding the claimant's limitations and instead interpreted the "raw data" and rendered his own conclusion that the claimant was capable of routine, repetitive work in his RFC assessment, thereby necessitating remand. <u>Id</u>. at *4. (<u>Id</u>. at 12-13.) In addition, Claimant argues that the Fourth Circuit has agreed with other circuits in holding that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" <u>Mascio v. Colvin,</u> 780 F.3d 632, 638 (4th Cir. 2015) (<u>Id</u>. at 14.) Finally, Claimant argues that the ALJ should have either ordered a psychological consultation, or obtained an updated psychological opinion to properly account for his conclusions. (<u>Id</u>.)

The Commissioner responds that the ALJ's decision is based on substantial evidence and must be upheld and reminds the Court that an RFC assessment is not a medical opinion, but a finding reserved to the Commissioner, and therefore, Claimant's argument has no merit. (Document No. 13 at 11-18.) Further, the Commissioner contends that at the administrative hearing level, the ALJ has the authority to craft the RFC, based on the entire record, not just upon

---

[4] <u>Grimmett v. Heckler</u>, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974); <u>McLain v. Schweiker</u>, 715 F.2d 866, 869 (4th Cir. 1983)).

medical opinion evidence per 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). (Id. at 12.) If there is sufficient evidence to support an ALJ's conclusions, then he is not obligated to obtain a medical opinion. (Id. at 13.) Moreover, the Commissioner contends that in this case, there was ample evidence supporting the ALJ's conclusions that Claimant retained the mental ability to understand, remember, and carry out simple instructions, and even though Claimant does not contest the ALJ's evaluation of the medical opinion evidence, the Commissioner states that the ALJ's evaluation complied with the Regulations. (Id. at 14-15.)

The Commissioner also points out that Claimant's reliance on certain legal authority is misplaced, because it predates the promulgation of Section 404.1527 for weighing opinion evidence; further, there were several psychological opinions from which the ALJ could review, and he simply did not find certain opinions as restrictive in their findings. (Id. at 16.) Due to the conflicting opinion evidence of record, the ALJ had to duty to reconcile same to reach his conclusions. (Id.) The Commissioner also disagrees that the Webster case is on point due to the factual differences, making remand unnecessary. (Id. at 17.) The Commissioner also states that the ALJ sufficiently explained his reasons in his opinion, thereby allowing for meaningful judicial review under Mascio. (Id. at 16-17.) Finally, the Commissioner reminds the Court that an ALJ has discretion to obtain a consultative medical opinion, however, there was sufficient evidence available in this case that a consult was not needed. (Id. at 17.)

In reply, Claimant argues that the ALJ's RFC must be based upon the evidence of record, and not the product of his own lay opinion. (Document No. 14 at 1-7.) Further, the Regulations require an ALJ to weigh all medical opinions in the evidence, not reject them all and formulate his own. (Id. at 2.) Claimant also argues that an ALJ must provide explanations for his findings; it is

not a Court's job to find the reasons therefore, as to do so is error, and the proper course is to remand. (Id. at 3-4.) Claimant further contends that the Commissioner's argument that the ALJ's conclusions were based upon the opinion evidence of record is incorrect: the ALJ expressly rejected them, but provided no contrary persuasive evidence to support his conclusions in his RFC assessment. (Id. at 5.) Claimant states that this case is factually analogous to the Webster case because the ALJ failed to provide a narrative discussion[5] of the evidence supporting his RFC assessment when he expressly discounted medical opinions of record. (Id. at 6.) Finally, Claimant argues that Mascio dictates remand of this case because the ALJ failed to account for his findings that Claimant was moderately restricted in concentration, persistence or pace, or at least explain why such restriction was unnecessary in his RFC assessment. (Id. at 6-7.)

Analysis

It is well known that the RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. § 404.1546.

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

> Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Fourth Circuit recognized that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (Citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)).

---

[5] See Wallace v. Colvin, 2016 WL 749042 at *5 (S.D.W.Va. February 1, 2016).

Social Security Ruling 96-7p[6] clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. § 404.1529 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

It is notable that in the Webster case, the court recommended that the matter be remanded back to the Commissioner for further consideration of the claimant's RFC because the ALJ did not acknowledge the contrary evidence within the treatment records, and only acknowledged the evidence within those records that supported his conclusions. Webster v. Colvin, 2014 WL 4060570 at *5. It is clear that the ALJ's omission was harmful error based upon his pronouncement during the administrative hearing that he would give greater credence to the claimant's longitudinal

---

[6] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 16, 2016, however, SSR 96-7p was in effect at the time of the decision, May 5, 2014.

treatment records. Id. Further, only three mental health opinions were in the record, and each included restrictions that were not addressed at all by the ALJ: that the work environment be "stable" or "low-stress" to accommodate the claimant's mental impairment. Id. at *4. The court also found that the ALJ did not offer any reason to discredit those limitations opined by the consulting psychologists. Id.

The undersigned disagrees with Claimant that the facts in the Webster matter are analogous to those in this case. For starters, the ALJ noted that none of Claimant's severe impairments, including his mental impairments, met the Listings.[7] (Tr. at 207-208.) The ALJ acknowledged that the State agency consultants' Psychiatric Technique Assessments revealed no limitations in Claimant's activities of daily living, concentration, persistence or pace, with only mild limitation in social functioning. (Tr. at 208.) The ALJ also noted that the unsigned mental health medical source statement indicated Claimant had moderate deficiencies in social functioning "due to a lack of social support, in concentration based on self-report, and in task persistence based on observation." (Id.) The ALJ noted that the unsigned medical source statement found Claimant's pace within normal limits, although in terms of activities of daily living, he isolated himself and withdrew from most activities outside of the home. (Id.) Ultimately, the ALJ found Claimant had mild limitations in terms of activities of daily living, social functioning and no episodes of decompensation. (Tr. at 208-209.) With regard to concentration, persistence or pace, the ALJ found Claimant had moderate difficulties.[8] (Tr. at 209.) This finding was expressly supported by the evidence from Claimant's adult function report, Dr. Dunn's observation that Claimant's pace

---

[7] The ALJ also found Claimant's mental impairments did not satisfy "paragraph C" or "paragraph B" criteria listings. (Tr. at 209-210.)

[8] A discussion on this finding is explored in further detail, *infra*.

was moderately deficient, as well as Dr. Powell's medical source statement that Claimant's pain symptoms were severe enough to interfere with his attention and concentration. (Id.)

Following his RFC assessment, the ALJ outlined the evidence supporting same. (Tr. at 210-214.) The ALJ noted that the "objective findings" did not support Claimant's allegations, and "reveal that he is not credible." (Tr. at 211.) In addition to finding his physical impairments were more mild than alleged, the ALJ reviewed the evidence concerning Claimant's mental impairments including: Claimant's statements "either in forms completed in connection with the application and appeal, in medical reports or records, or in [his] testimony" (Tr. at 212.); Dr. Dunn's observations (Id.); and Dr. Powell's treatment notes and her medical source statement. (Tr. at 211, 212-213.) The ALJ found that the objective medical evidence of record did not support Claimant's subjective complaints and alleged limitations with regard to his mental impairments. (Tr. at 211, 212.)

The ALJ acknowledged that in a recent progress note, Dr. Powell "found a normal mental status examination. (Exhibit 10F p. 8)"[9] (Tr. at 211.) The ALJ also noted that PA-C Zhang evaluated Claimant in September 2012 and reported his mood was "slightly depressed", had a full affect with an assessment of "mood disorder not otherwise specified", and a GAF score of 65.[10] (Tr. at 212.) Additionally, the ALJ noted that in October 2012, Dr. Dunn reported Claimant's mood as "varying between cheerful and sad. Affect was labile. The claimant was fairly outgoing and

---

[9] This note is dated March 13, 2014. (Tr. at 607.)

[10] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed. 1994).

friendly. Concentration, immediate memory, social functioning, and persistence were normal. Recent memory and pace were moderately deficient. Remote memory was mildly deficient." (Id.) Dr. Dunn also assessed Claimant's GAF score at 65 with "mild symptoms". (Id.)

Moreover, the ALJ mentioned evidence that indicated Claimant stopped working for reasons unrelated to his impairments, for instance, when he inherited a substantial sum of money that allowed him to be a stay at home dad while his wife worked; also Claimant reported that he was going to go on a world tour with a band around the time of his alleged onset date. (Id.) The ALJ noted that during the hearing, Claimant recounted that the tour never happened, although he was invited to go; the ALJ gleaned from this that Claimant "had a greater ability to interact with others and engage in activity than alleged." (Id.)

The ALJ also discussed other evidence that supported a finding that Claimant's mental health impairments were mild, such as how medication was effective in controlling his symptoms; the ALJ found that Claimant denied having "significant low mood or depression, episodes of mania, hallucinations, delusions, or paranoia" since he started taking medication for his psychological problems. (Id.) The ALJ noted that a Westbrook Health Services treatment note from December 2013 indicated Claimant was psychiatrically stable requiring no change in medications, and he reported doing well. (Id.)

Regarding the opinion evidence with respect to Claimant's mental impairments, the ALJ noted that Dr. Powell opined Claimant was capable of working in a low stress job, but only with several physical limitations and accommodations that precluded full time work at any exertion level. (Tr. at 212-213.) The ALJ gave this opinion "little weight" for being inconsistent with the medical record of evidence, and that Dr. Powell's medical source statement was inconsistent with

her own treating notes and consultant letters written to her. (Tr. at 213.) Further, the ALJ found

Claimant to be stable from a cardiac standpoint and stable on his medications; despite the fact that

Claimant gained weight, he was advised to *increase* his activity level. (Id.) (emphasis added) The

ALJ further noted that x-rays of Claimant's knees and lumbar spine showed only mild changes.

(Id.) The unsigned medical source statement was also given "little weight" by the ALJ because he

found it "inconsistent with the medical record of evidence and unsupported by attached treatment

notes." (Id.) The unsigned statement indicated Claimant "would likely have disruptive conflicts

with coworkers and supervisors in a work setting due to his depression and irritable mood",

however, the ALJ noted that Westbrook Health Services records also indicated Claimant "has done

well with medication management and had only a mild impairment." (Id.) Finally, the ALJ noted

that the record contained evidence that Claimant was assigned GAF scores ranging from 55 to 65

(from moderate symptoms to mild symptoms), but the evidence also suggested that he was

"generally functioning pretty well, has some meaningful relationships." (Tr. at 213-214.) The ALJ

found GAF scores "in general are of limited evidentiary value" since they only provide "snapshots

of impaired and improved behavior." (Tr. at 214.) Overall, the ALJ did not find Claimant's

subjective complaints and alleged limitations persuasive. (Id.)

   From the foregoing, the ALJ's decision herein was obviously unlike the omissions found

in the Webster case: the ALJ provided a fairly detailed "narrative discussion"[11] of the evidence

that detailed both externally and internally conflicting evidence of record, as well as a discussion

---

[11] In accordance with SSR 96-8p: the undersigned notes that Claimant cites Wallace v. Colvin, 2016 WL 749042
(S.D.W.Va. February 2016) wherein the Court found the ALJ's decision was not supported by substantial evidence
because of the ALJ's questionable out-of-sequence credibility assessment after the RFC determination, and also
because the decision lacked the "narrative discussion" of certain "Migraine Journal" evidence that would have had
significant bearing on the claimant's credibility assessment. Id. at *5. There was no issue raised on appeal with respect
to the ALJ's credibility assessment of Claimant in the case at bar.

of the evidence justifying his RFC determination. Further, despite Claimant's contention that the RFC assessment was developed in the absence of the psychological opinions in the record, it is clear from the record that this was simply not the case; the ALJ herein provided ample evidence in support of the RFC assessment with respect to Claimant's mental impairments, which were reportedly stable with medication, and/or more mild than alleged. In short, there is no evidence that the ALJ impermissibly substituted his own lay opinion in place of expert opinions or that he interpreted the raw data to compose the RFC determination; the ALJ explicitly cited specific evidence in the record to support the findings and conclusions in the decision. Accordingly, the undersigned finds that Claimant's argument to the contrary lacks merit.

With regard to the ALJ's finding that Claimant had moderate difficulties in concentration, persistence or pace, and the resulting RFC accommodation for same by placing Claimant in a work environment where "[h]e is further limited to understanding, remembering, and carrying out simple instructions" (Tr. at 210.), the ALJ specifically found moderate limitations in this area (Tr. at 209.) based on Dr. Dunn's finding Claimant's pace and recent memory were moderately deficient (Tr. at 408.), as well as Dr. Powell's observation that Claimant's pain or other symptoms were "occasionally" severe enough to interfere with attention and concentration needed to perform even simple work tasks. (Tr. at 610.) As discussed *supra*, the medical evidence of record from these providers also illustrated that Claimant's mental health issues were mild and stable with medication. These medical findings and observations combined with the ALJ's duty to evaluate such opinion evidence pursuant to 20 C.F.R. § 404.1527, Claimant's argument that the ALJ's mental RFC limitation "to simple work was in conflict with Dr. Powell's opinion" is not persuasive. (Document No. 14 at 5.)

It is also important to bear in mind that in <u>Mascio v. Colvin</u>, the Court determined that nowhere did "the ALJ explain how he decided which of Mascio's statements to believe and which to discredit, other than the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering Mascio's residual functional capacity." 780 F.3d at 640. It was this "lack of explanation," the Court held, which "requires remand." <u>Id</u>.[12] Remand would be inappropriate and unnecessary in this case, as the ALJ adequately explained his findings supporting his decision, thus allowing for meaningful judicial review. Accordingly, the undersigned finds that the Commissioner's decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 12.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 13.), and **AFFIRM** the final decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed

---

[12] The facts of <u>Mascio</u> is a case study of an ALJ decision rife with error: there were conflicting RFC assessments by two State agency consultants, the ALJ's findings were more consistent with one, but did not mention it, and the ALJ's discussion of the other trailed off at the point of weighing the evidence; the RFC was lacking in analysis for meaningful review; and of grave importance, the ALJ assessed the claimant's credibility after the RFC in contravention of the Regulations.

Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 29, 2016.

Omar J. Aboulhosn
United States Magistrate Judge